## Snowden *v.* Webb.

May 18, 1953

No. 38696 32 Adv. S. 49 64 So. 2d 745

O. W. Cameron and Ben F. Cameron, for appellant,

666

*Snow & Covington,* for appellee.

ARRINGTON, J.

This is an appeal from a judgment for damages in favor of appellee for personal injuries sustained by her as the result of a collision between an automobile which she was driving and an automobile driven by appellant on Highway No. 45 at a point about eight miles north of the City of Meridian. The proof shows that both cars were traveling in a northerly direction in a slow drizzling rain and that the collision occurred about 7:30 A.M. when appellee undertook to pass appellant at a time when appellant was undertaking to make a left turn into a private driveway which led into a field belonging to one Lamar Lyle, where a house was under construction approximately 500 to 600 feet from the highway. The declaration charged that when Mrs. Webb approached the Snowden car he was traveling on the right side of the highway, that Mrs. Webb sounded her horn as a signal to Snowden that she intended to pass him on the left side, that it was Snowden's duty not to turn his automobile across the left portion of the highway without first determining whether other traffic on the highway was attempting to or was in the act of passing his automobile, and, further, not to turn his automobile across the left side of the highway at a time when to do so would be likely to cause a collision with another automobile, and not to attempt to cross the left lane of the highway without first giving an adequate warning signal of his intention so to do, but that he negligently failed to observe these duties and turned his automobile from the right lane to the left lane of said highway and ran the same into the side of the automobile which Mrs. Webb was driving.

Appellant argues two grounds for reversal. The first is prejudicial error alleged to have been committed by counsel for plaintiff in one question to a witness and in his argument to the jury, and the second is that the verdict is against the overwhelming weight of the evidence. Since the second ground requires a review of the evidence, we shall consider it first.

The highway was of standard concrete construction with a marked line down the center. It was practically level and was perfectly straight for a considerable distance in both directions from the scene of the collision. There were no houses near the highway at that point. Snowden was a carpenter foreman and lived in Meridian. On the morning in question he had picked up C. E. Tolbert, W. R. Jackson, and Charles M. Craven, white, and Charlie Hall, colored, in Meridian, and all of them were en route to the Lyle house under construction for the purpose of working thereon that day. Mrs. Webb testified that she was fully alert as she traveled north along the highway. She overtook a Ford pick-up truck driven by J. W. Newell and passed it. She then got back into the right lane of traffic and shortly afterward approached the Snowden car which was traveling about fifteen miles per hour. She was driving about 45 to 50 miles per hour. About 100 feet before reaching Snowden, she sounded her horn as a signal to Snowden that she intended to pass and steered her car into the left lane of the highway again. Snowden gave no signal or warning of any kind that he intended to make a left turn. She did not notice the little private driveway which led off to the left. Just as she was in the act of passing the Snowden car, he turned to the left without warning; she turned the left wheels of her car onto the shoulder of the highway in an effort to avoid being struck, but nevertheless the left front of the Snowden car struck her car on the rear right side at a point opposite the private driveway and knocked her down a steep embankment.

J. W. Newell testified that he was traveling north on the highway at a speed of about 25 or 35 miles per hour and that Mrs. Webb passed him when he was about 300 yards behind the Snowden car. She was driving about 45 or 50 miles per hour. She turned back to the right side of the highway and as she approached the Snowden car she again moved over into the left lane. "She swung it far enough I had vision of the two cars. . . . Wasn't a thing in the world between me and the two cars that come together." Newell further testified that when Mrs. Webb started to pass the Snowden car, Snowden "cut right in. He didn't cut in at the front, he didn't cut in at the center; he cut in on the right of the rear right fender as she started around him." When asked as to whether any signal was given of Snowden's intention to turn left, he said, "If it was, I certainly didn't see it, and I was looking dead down the road." He testified that at the moment of the collision Mrs. Webb's left wheels were two and a half to three feet off the pavement on the left side, and that Snowden crossed over the center line to the left and struck her with his left front and that it bent Snowden's front bumper. This was all the evidence for plaintiff on the issue of negligence.

Tolbert testified that he was riding on the back seat immediately behind Snowden; he heard no horn blow; Snowden slowed down to about ten miles per hour and extended his hand for a left turn about fifty or sixty feet before reaching the private roadway and then pulled it back in; Tolbert did not know that another car was approaching; he heard the horn on the Webb car just as the two cars collided; he said Mrs. Webb was driving sixty miles per hour and that the collision occurred at a time when Snowden had not begun to turn to the left but at a time when it was opposite the private driveway.

W. R. Jackson testified that he was riding in the middle of the back seat. He did not know the Webb car was approaching. He said that Snowden held out his hand for a left turn as they approached the driveway, but gave

no estimate of the distance from the driveway when this was done and did not state how long the signal was given. He gave no estimate of the speed of Mrs. Webb's car.

Charles Craven said he was riding on the front seat with Snowden; they were talking; he first said that the first he knew of the Webb car was when it came in contact with the Snowden car; then he said "we" saw the Webb car about 200 yards behind us; Snowden gave a signal for a left turn about 100 to 125 feet from where he began to turn; Mrs. Webb was driving 75 or 80 miles an hour; before Snowden turned "he pulled his arm in to make the turn." He knew this was a dangerous place to turn and he told Snowden "there comes a car." The Webb car was then "a hundred or two foot down the road."

Charlie Hall testified that he was riding in the Snowden car on the right side on the back seat; he looked back and saw the Webb car coming about 140 or 150 feet behind, and Tolbert and Jackson also looked back; Snowden gave a signal for a left turn before he reached the private driveway and was turning at the time of the collision. He estimated the speed of the Webb car at 75 miles per hour or more.

Snowden testified that when he was about 100 or 150 feet from the private driveway he looked in the rear view mirror and saw the Webb car approaching about a block and a half or two blocks behind him; he gave a left hand signal and slowed down to five or ten miles per hour and pulled in his hand and caught the steering wheel and shifted into second gear to make his turn, and about that instant the collision occurred. He admitted that he did not continue to watch the Webb car in his rear view mirror. He did not hear Craven tell him that a car was coming from behind.

Section 8192, Code of 1942, provides in part: "(a) No person shall turn a vehicle from a direct course upon a highway unless and until such movement can be made with reasonable safety and then only after giving a

clearly audible signal by sounding the horn if any pedestrian may be affected by such movement or after giving an appropriate signal in the manner hereinafter provided in the event any other vehicle may be affected by such movement. (b) A signal of intention to turn right or left shall be given continuously for a reasonable distance before turning.'' Section 8193, Code of 1942, provides that the signal to turn may be given by means of the hand and arm or by a signal lamp or device, and Section 8194 provides that if the hand and arm signal is used the signal for a left turn shall be by extending the hand and arm horizontally.

We here emphasize that our statutes provide that no vehicle shall be turned from a different course upon a highway until such movement can be made with reasonable safety and that if any other vehicle is affected by such movement the signal of intention to turn shall be given *continuously* for a reasonable distance before turning.

Section 1455, Code of 1942, provides that ''all questions of negligence and contributory negligence shall be for the jury to determine.'' That is the legislative mandate and that is the rule which this Court has followed in cases too numerous to mention. We think that ▮▮ ▮ it was a question for the jury to say whether Snowden started turning his car at a time when the turn could not be made with reasonable safety, and also whether Snowden gave any signal at all of his intention to turn and whether, if he gave a signal, it was given continuously for a reasonable distance before turning.

The argument is made that Snowden had more witnesses than the plaintiff on the crucial issue as to the signals and that for this reason the verdict of the jury in plaintiff's favor is against the overwhelming weight of the evidence. ▮▮▮ We do not agree with that contention. In the case of Burrill v. Rau, 153 Miss. 437, 440, 121 So. 118, it was said: ''The jury heard all the witnesses testify,

and saw their demeanor on the witness stand. It is within the exclusive province of the jury to pass on the credibility of witnesses. The character and weight of the evidence should control the jury in arriving at their verdict, not the number of witnesses testifying to the existence of an alleged fact.'' And in Lockhart v. Bethea, 44 So. 2d 851, 852, not reported in the State Reports, this Court said: ''Weight of testimony is not adjudged by mere superior numbers. It is qualitative and not quantitative.'' It is our conclusion that the question of negligence was for the jury's determination and that its verdict is not against the weight of the evidence. It was the peculiar province of the jury to judge the weight and worth of the testimony of the various witnesses. For instance, the jury could well have discounted Tolbert's estimate of the speed of the Webb car when he admitted that he did not know a car was approaching until the crash. Likewise, the jury could have found from the testimony of Snowden's witness Craven that Snowden had ample warning of the approach of the Webb car and negligently turned his car in violation of the statute from a direct course on the highway at a time when a left turn could not be made with reasonable safety. Also, the jury could have found from Snowden's own testimony that after having seen the Webb car approaching on the open road a block and a half or two blocks behind him and well knowing that he had slowed down to five or ten miles an hour, as he said, he should have known that he could not make a left turn with reasonable safety and that he was negligent in undertaking to make the turn when he did; that if he had been using his rear view mirror he should have known that the Webb car had overtaken him and was about to pass him. The solution of such questions as those stated, as well as all other disputed questions of fact, is peculiarly for the jury under our statute and decisions.

Appellant also complains at what he calls veiled references to insurance made by appellee's attorney and also

certain remarks made by appellee's counsel in his closing argument. When Mr. Snowden was under cross-examination the following occurred:

"Q. Now, Mr. Snowden, immediately after this accident occurred, you got Mr. Phillip Keene to come out there to take statements, didn't you?

"BY MR. CAMERON: We object to that as being incompetent, irrelevant, and immaterial, and has no relevancy to the facts of this accident or the liability of the parties.

"BY THE COURT: Sustained.

"BY MR. SNOW: If your Honor please, I want to ask him what he told Mr. Keene.

"BY THE COURT: I sustain the objection."

Appellant argues and would apparently have us take judicial notice of the fact that Mr. Keene is an insurance adjuster and that a mere reference to his name was in effect telling the jury that Snowden had insurance on his automobile. The question was raised in a motion for a new trial and evidence was taken thereon. It appears from that evidence that Mr. Keene investigates accidents both for insurance companies and for individuals, and moreover, that counsel for plaintiff was seeking to show that Mr. Snowden gave to Mr. Keene a version of the accident which was different from that to which he testified. ▮▮▮ At any rate, the trial court sustained an objection to the question and that ended the matter without any motion being made for a mistrial. The trial court did all that he was then called upon to do and we cannot see that the mere mention of a man's name is conveying to the jury the idea that there is liability coverage in the case.

According to a special bill of exceptions taken after the trial, counsel for plaintiff made the following statements in his closing argument:

"When I came to the bar here in Meridian, Mr. Ben Cameron was representing the big corporations and was doing as he is doing now,—making the argument that

jurors could not return a verdict against his client unless they found the witnesses were lying, and adroitly making that appeal in those cases, as he has in this case.

"And Mr. Winston Cameron said to you that any verdict would come out of Mr. Snowden's wages. I covenant with you gentlemen that not one cent of this would come out of Mr. Snowden's pocket or wages."

The bill of exceptions further shows: "Thereupon Mr. Ben Cameron excepted to the argument made on the grounds that it was incompetent, irrelevant, and immaterial and not based on any evidence, and was inflammatory and prejudicial. Whereupon the court stated 'The objection is sustained.' Thereupon Mr. Snow, addressing the court, stated: 'Does your Honor hold that I can't answer him on that feature of this matter, that I can't answer him as regards the matter of this man's wages?' Thereupon the court stated, 'I have ruled, Mr. Snow, and have sustained the objection.' "

Addressing ourselves first to the first paragraph of the argument shown by the bill of exceptions, it is apparent that counsel for defendant had appealed to the jury on the basis that if they did not find for the defendant, this was tantamount to a finding that his witnesses had committed perjury. Opposing counsel made the statement in reply that this same argument had been repeatedly made to juries in the county for the past twenty-five years. The mere reference to the fact that Mr. Cameron had represented big corporations did not carry any inference that he was representing an insurance company in the case then on trial. In 53 Am. Jur., p. 373, Trial, Sec. 468, it is said: "If counsel for a party litigant or for the defendant in a criminal prosecution pursues an improper line of argument, he thereby invites a reply, and statements made by opposing counsel or the prosecuting attorney by way of retaliation thereto have often been considered proper which would otherwise be objectionable. This principle has been applied although

the statements in reply were irrelevant, where they were in reply to irrelevant matter in the argument of opposing counsel, and although the retaliatory language might otherwise be improper as an appeal to racial or national, religious, political, or social prejudice generally.''

As to the second paragraph of the argument as shown by the bill of exceptions, it appears that one of counsel had told the jury that any verdict they might render for the plaintiff would have to be paid by the defendant out of his wages, and in response to that statement opposing counsel told the jury that not one cent would come out of the pocket or wages of the defendant. It is argued that the statement of plaintiff's counsel was in effect telling the jury that the defendant carried liability insurance. If that be the effect of it, then the effect of what defendant's counsel had said to the jury just previously was that the defendant did not have any liability insurance. In other words, it is clear that the remarks of counsel for plaintiff were invited by counsel for defendant. In the case of Avent v. Tucker, 188 Miss. 207, 225, 194 So. 496, we held: ''. . . it is argued here now that the court should have permitted the jury to be informed that Mrs. Avent carried no liability insurance. In other words, the jury were to be told that whatever verdict they might render against Mrs. Avent would necessarily have to be paid by her for the reason that the plaintiff in a suit may not show that the defendant carried insurance against the particular event involved. The converse is true that it may not be conveyed to the jury that the defendant in the case has no protection by insurance, and if the verdict is against him, he, and not an insurance company, must pay it. To hold otherwise would be to abolish the rule as announced by this court in the case of Herrin, Lambert & Company v. Daly, 80 Miss. 340, 31 So. 790, 92 Am. St. Rep. 605, which has been consistently followed by this court. It would be manifestly unfair to permit a defendant in a damage suit to show that he carried no insurance

and whatever verdict was rendered would be enforced upon him personally.''

In the recent case of Petermann v. Gary, 210 Miss. 438, 448, 49 So. 2d 828, the point now raised by appellant was decided adversely to his contention with this statement: ''The reference to insurance protection carried by Petermann Brothers in this case, however, was made by one of the defendants, Foster, in answer to a question propounded to him by the defendants' own attorney, 'and for that reason the defendants are not in a position to take advantage of the rule laid down in Herrin v. Daly, supra, and followed in the later cases cited above.''

In the present case, counsel for the defendant told the jury that any verdict they might render for plaintiff would have to be paid by defendant out of his wages. It was proper for plaintiff's counsel to reply to this. Counsel for plaintiff had to do something to remove the sting and effect of such an argument and his reply was invited by the remarks of counsel for defendant. We think he was justified in saying to the jury just what he did say, and furthermore, the trial judge sustained an objection to his argument and told the jury that plaintiff's counsel could not reply to what had been improperly injected into the argument by defendant's counsel, so, even if the remarks of plaintiff's counsel had been improper, they were immediately excluded by the trial judge. Since we find no reversible error in the record, the judgment will be affirmed.

Affirmed.

*Hall, Lee, Kyle, Holmes, Ethridge,* and *Lotterhos, JJ.,* concur.

*McGehee, C. J.,* and *Roberds, J.,* dissenting.

---

ROBERDS, J., Dissenting.

The wrong person brought this suit. Plaintiff should have been defendant. The case was tried out on the issue whether or not Snowden gave a left-turn signal.

Plaintiff introduced two, and only two, witnesses on that question—herself and Newell.

She testified she passed Newell and came back into the east, or right, lane of the road and was traveling directly behind the Snowden car; that he gave no signal; that she pulled to the left to pass him. Her statement that Snowden gave no signal is the only testimony in this record that he did not do so. She, of course, was very much interested in the outcome of the lawsuit, and her testimony is greatly weakened by two factual situations: First, the testimony proves, and pictures disclose, that there was a concrete bridge leading off the main highway to the road running to the left, visible to motorists going in both directions on Highway 45. Mrs. Webb admitted she saw that Snowden was slowing down and, as a reasonable person, she might have anticipated he was going to turn to the left. In addition, to show the unreliability of her testimony, when asked whether she blew her horn as a warning to Snowden she was going to pass him, she said, "Well, I just blew the horn, and I don't know whether it was a long blow, or just two or three little ones. I imagine it was a long blow." Boiled down this means she does not know whether she blew the horn or not.

Newell testified he was driving north and Mrs. Webb passed him when he was three hundred yards south of the Snowden car; she cut back into the east lane some sixty feet ahead of him. He admitted he could not see the Snowden car after she got back into the lane ahead of him. He did not know, and did not purport to say, whether Snowden gave a left-turn signal or not. He simply said he did not see any. He did say that he never heard Mrs. Webb blow her horn after she passed him.

That was the testimony of plaintiff on the crucial question whether Snowden gave a left-turn signal.

This is the testimony on behalf of defendant on whether or not the signal was given. There were five men in the

Snowden car. All of them testified. It is not shown that any of them, other than Snowden himself, had any interest whatever in the outcome of this litigation.

C. E. Tolbert testified he was a carpenter and lived in Meridian. He and Jackson and Hall were on the back seat of the Snowden car. Witness was sitting directly behind Snowden, the driver. He said that Snowden put his left hand outside the left window and gave a proper turn signal some sixty feet before getting to the turn-off. The left window was down; that he continued to give this signal for a distance from the witness stand to the back end of the courthouse in Meridian. In the meantime Snowden was gradually slowing down and was going about ten miles per hour as he approached the turn-off. He said Mrs. Webb was running about sixty miles per hour as she undertook to pass the Snowden car. She struck the Snowden car on the left thereof.

Jackson was riding in the middle on the back seat. He said Snowden was driving about forty miles per hour until he got to within about 200 feet of the turn-off; that he put his left hand out the window and continued to give a left-turn signal, slowing down to ten miles per hour as he approached the turn-off; that the Webb car struck the left side of the Snowden car just as Snowden was beginning to turn. He didn't estimate the speed of the Webb car but did say it continued some 150 feet north after the collision.

Hall was on the right side of the back seat. He saw Snowden give the turn signal by placing his hand out the left front window. He then looked back through the rear view window and saw a car approaching in the same lane some distance back; that the reason he looked back was because he saw Snowden give the turn signal. He said Snowden had slowed to ten miles per hour and was about to turn when the accident occurred. He estimated Mrs. Webb was running about 75 miles per hour when she tried to pass the Snowden car.

Charles Craven was riding on the right of the front seat. In other words, he was sitting beside Snowden. He operated a service station in Meridian. He said he was familiar with automobiles. He testified Snowden began to give the turn signal 150 feet before reaching the turn-off and he continued to slow down and give the signal until he reached the turn-off and had to pull his left hand in to shift the gears of his car for the turn. He said he saw a car behind the Snowden car when Snowden began to give the turn signal; that the rear car was some two hundred yards behind the Snowden car. He could not tell how fast the car was running, but as the Webb car collided with the Snowden car he estimated the speed of the Webb car to be around 75 miles per hour.

Snowden testified he was driving about 35 miles per hour; that about 100 to 150 feet before reaching the turn-off he put out his left hand and gave a proper turn signal; that he gradually slowed down reducing his speed to some 5 miles per hour as he approached the turn-off; that he continued to give the signal until it was necessary to pull in his hand to aid in shifting the gears into second gear to make his turn; that he saw a car approaching from the rear; that it was around two city blocks back when he began to give his signal; that he did not then know, and could not tell, how fast it was running; that the Webb car hit the left rear and left side of his car; that it was then running some 70 miles per hour. Snowden said he had been driving an automobile for many years; that he had had much experience in driving jeeps during the Second World War.

Snowden put on other witnesses who were nearby the scene of the accident, whose testimony was favorable to his contention, but I deem it unnecessary to set it out.

It will be noted that all of defendant's witnesses, whose testimony is set out above, were right in the car with Snowden. They had reason to note his actions and were in position to see and know the facts. Plaintiff did not attack the credibility of any one of them.

Mrs. Webb lived in Jackson, Tennessee. She testified she had been to Mardi Gras in New Orleans. She had driven all the night before. She had not slept during that night except about two hours in the car some 25 miles south of Meridian. She was behind time on her return to her husband and three children. She was in the car alone. This combination of circumstances has some bearing upon her urge to pass the other motorist ahead of her and her failure to see, if she did fail to see, the signal given by Snowden.

It does seem to the writer that the verdict in this case was against the great weight of the evidence.

———

McGEHEE, C. J., Dissenting.

I do not think that the judgment in this case should be affirmed for the reason that the verdict of the jury is in my opinion against the overwhelming weight of the evidence as to who was at fault in the accident.

———

ON MOTION TO STRIKE AND ON SUGGESTION OF ERROR

July 3, 1953 35 Adv. S. 13 65 So. 2d 839

LOTTERHOS, J.

Appellant has filed a motion to strike from the record certain parts thereof purporting to disclose what occurred during the argument of this case to the jury, concerning statements in argument by counsel for both parties, and also to strike certain language from our original opinion as not supported by the record. Appellant has filed with the motion a suggestion of error seeking, in effect, the same relief, and asserting that the cause should be reversed. Exception is thereby taken to that part of our opinion declaring that appellant's attorney told the jury in argument that any verdict rendered for appellee would have to be paid by appellant out of his wages, and that

part using this supposed statement as a basis for the affirmance of the judgment.

We have carefully reviewed the pertinent portion of the record in order to determine whether the exceptions are well taken. It appears that, immediately after the arguments to the jury had been completed and the jury had retired, counsel for appellant stated into the record his version of what had happened, and that after a brief colloquy the court said that a bill of exceptions would be allowed in accordance with the statements made by counsel. Appellant then made his motion for a mistrial, which was overruled. With reference to the bill of exceptions, the court stated that before signing it he would submit it to appellee's attorney.

Thereafter on a subsequent day, appellee by her attorney submitted her proposed bill of exceptions, setting up her version of what took place during the argument, but the court declined to sign it. Appellee was permitted to make a record of the testimony in support of her version of what had happened. A statement by appellant's attorney was also included in the transcript. The court signed the bill of exceptions tendered by appellant, with slight modifications.

There is an apparent conflict between appellee's proposed bill of exceptions (not signed by the court) and appellant's bill of exceptions (signed by the court), and between the statements of appellant's counsel and of the witnesses as shown in the transcript, with respect to whether counsel for appellant made the statement in argument to which exception has been taken.

It is not for this Court to resolve disputes between parties or their attorneys as to what happened at the trial; that is a function of the trial court. We cannot properly consider what is set out in the unsigned bill of exceptions which appellee requested, nor weigh the testimony and statements which the trial judge heard in passing upon these matters. We must look only to

the signed bill of exceptions in determining what was said in argument, for purposes of our decision. This conclusion is supported by the following cases: Pittman v. State, 155 Miss. 745, 124 So. 761; Geiselbreth v. Mississippi Power and Light Co., 166 Miss. 749, 147 So. 874; and Richardson v. State, Miss., 17 So. 2d 214.

Upon reconsideration by the Court of the matters under discussion, a majority of the judges are of the opinion that the bill of exceptions in this record is properly construed as showing, for purposes of this decision, that counsel for appellant did use the argument in controversy. Although the bill of exceptions reflects the questioned language only in a quotation from appellee's argument, which purports to be in answer thereto, yet there is nothing in the bill of exceptions stating or implying that the comment so made by the attorney for appellee, to the effect that appellant's attorney so stated, was false.

Accordingly, it is our decision that the motion and the suggestion of error should be overruled.

Motion to strike and suggestion of error overruled.

*McGehee, C. J.,* and *Roberds, J.,* dissent; all other Justices concur.

----

ON SECOND SUGGESTION OF ERROR

October 5, 1953 37 Adv. S. 30 67 So. 2d 251

LEE, J.

A suggestion of error was overruled in this case on July 3, 1953, (Miss.), 65 So. 2d 839.

Appellant has now filed what he denominates as "Suggestion of Error, Motion to set aside Judgment, to Stay Mandate and for Other Relief."

The Court deems that the contents of this complaint, except that part with reference to striking certain language from the opinion, in fact, constitutes a second sug-

gestion of error, and, for that reason, can not be entertained. Section 3, Rule 14, Revised Rules 1953.

While adhering to the original decision, the Court did not then, and does not now, intend any reflection on the high personal and professional reputation of appellant's counsel. Consequently, the words in the opinion, to-wit: "This was highly improper and unfair and was condemned in Avent v. Tucker, supra," are ordered stricken, and in lieu thereof are substituted the following: "It was proper for plaintiff's counsel to reply to this."

That part of the suggestion which has been deemed a second suggestion of error is dismissed, and that part which has been treated as a suggestion of error on a motion, is sustained.

Suggestion of error generally dismissed, but applicable part sustained in part.

All Justices concur.